| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JAYME GORDON<br><br>Defendant | Crim. No. 15-CR-10390-PBS |

## GOVERNMENT'S TRIAL BRIEF

On December 16, 2015, a grand jury returned an indictment charging Jayme Gordon with four counts of Wire Fraud (18 U.S.C. § 1343) and three counts of Perjury (18 U.S.C. § 1623). In this trial brief, the government will summarize the evidence it expects to present at trial. Witness preparation and trial planning is ongoing, and the government reserves the right to make adjustments to its planned trial presentation.

## I.     Jayme Gordon's Fraud Scheme and the Wire Fraud Counts

### *Kung Fu Panda*

The victim in this case is DreamWorks Animation LLC, an entertainment company founded in 1994 by Jeffrey Katzenberg, David Geffen, and Steven Spielberg, to develop and produce animated movies. One of DreamWorks' hit movies was *Kung Fu Panda*, which was released in June 2008. *Kung Fu Panda* is the story of a comical giant panda named "Po," voiced by Jack Black, who is trained to be a Kung Fu master by an older, wiser red panda named "Master Shifu," voiced by Dustin Hoffman. With the help of a group of animal friends called "The Furious Five," Po then uses Kung Fu to defeat an evil enemy leopard and save The Valley of Peace.

*Jayme Gordon*

Gordon is a Massachusetts resident and amateur cartoonist who has submitted cartoon drawings and ideas for animated stories to many production studios and literary agencies. From at least 1989 through 2000, Gordon sent proposals to Walt Disney Pictures, DreamWorks, and other production and publishing companies, asking if the companies wanted to collaborate with him on projects based on his characters. While Gordon kept copies of some of the cover letters he sent, he claimed that he did not keep copies of the work that he attached to those letters. The cover letters mention several of Gordon's stories, but none mention either pandas or Kung Fu.

In keeping with their standard practice, Disney, DreamWorks, and the other production companies sent Gordon letters rejecting his proposals. Rejecting unsolicited submissions is standard practice for production companies, in part because they hire teams of skilled creative talent to develop their characters, stories, and projects themselves, and in part because they hope to prevent lawsuits like the one Gordon filed.

In addition to submitting proposals to production companies, between 1990 and 1993, Jayme Gordon submitted more than 300 pages of material for registration with the U.S. Copyright Office in five separate deposits, protecting dozens of characters, story ideas, and drawings. This material contained only one drawing of a panda – a drawing of a character Gordon called "Penelopi Panda," which bears no resemblance to Po, the giant panda in the *Kung Fu Panda* movie.




Later, in 1999 and 2000, Gordon registered with the U.S. Copyright Office hundreds of additional pages of material, including a series of drawings and stories that he called "Jamie Gordon's Panda Power." These stories center around a giant panda named "Kid" and a small red panda named "Red," both of whom receive super powers from magical medallions that they wear around their necks.



While "Panda Power" centers around pandas, beyond that, Gordon's story and characters have very little in common with the story and characters in DreamWorks' subsequent *Kung Fu Panda* movie.

### Kung Fu Panda and Gordon's 2008 Registration

In early 2008, several months before the movie's June 2008 release, Gordon saw a trailer for *Kung Fu Panda*. After seeing that trailer, Gordon revised his 2000 "Panda Power" drawings and story, which he renamed "Kung Fu Panda Power." He made these revisions as part of his fraud scheme, so that his work would appear to be more similar to the DreamWorks pandas he had seen in the trailer.

Specifically, Gordon changed the appearance of his characters and reversed their

personalities, so that the characters more closely matched DreamWorks' giant and red panda characters. For example (1) Gordon removed the medallion and mask worn by the giant panda – an integral part of his earlier story, which was based on the pandas obtaining super powers from the medallions – and instead depicted the giant panda wearing shorts and a rope belt, as in Kung Fu Panda; and (2) Gordon reversed the personalities of the two pandas – his original story described the giant panda as serious and mature, in the big brother role, and the red panda as immature, while his 2008 story flipped these descriptions to be more in line with the Kung Fu Panda characters.

Gordon registered these altered drawings and story ideas based on them with the Copyright Office in May 2008, several months after he saw the *Kung Fu Panda* trailer but a month before the movie was released. While registering a work with the Copyright Office is not necessary for it to have copyright protection, it is necessary to register if the creator wants to file a copyright infringement suit.

### *The 2009 Sketches that Formed the Basis of the Civil Lawsuit*

Since Gordon admittedly filed the 2008 registrations after he had seen the *Kung Fu Panda* trailer, he had little chance of basing a successful civil copyright infringement lawsuit solely on these drawings. But in early 2009 a friend of Gordon's provided Gordon's attorneys with additional drawings of Gordon's panda characters that ultimately would help support the civil lawsuit against DreamWorks. Several of these drawings bore dates between 1990 and 1994. Unlike any of the drawings that Gordon registered with the Copyright Office before 2008, these drawings use the phrases "Kung Fu Panda Power" and "KFPP" and some show Kid Panda wearing shorts and a rope belt, like Po, DreamWorks' giant panda character. Thus, the drawings that were

dated from 1990 through 1994 were generally the same as Gordon's 2008 registration, not his 2000 registration.  Below are some examples of those drawings:

 

### *The 2011 Lawsuit and Settlement Proposal*

Based in part on these sketches, Gordon filed a copyright infringement suit against DreamWorks in the U.S. District Court for the District of Massachusetts in February 2011.  In the Complaint, Gordon falsely claimed that DreamWorks' "highly successful '*Kung Fu Panda*' franchise" was "based on and copied from copyrighted works authored and owned by Gordon, collectively titled 'Kung Fu Panda Power.'"

In fact, DreamWorks developed the concept for *Kung Fu Panda* based on the ideas and work of DreamWorks' employees, including founder Jeffrey Katzenberg.  DreamWorks then developed the characters and story with the help of writers in Hollywood whom it hired as independent contractors.

In a July 1, 2011 letter that Gordon's attorneys sent to DreamWorks' counsel by e-mail,

Gordon offered to settle his lawsuit in exchange for $12 million, plus a ½ percent royalty on all revenue from future sales of *Kung Fu Panda* products and services. DreamWorks rejected Gordon's settlement proposal, and the civil litigation continued for two more years. During that time, DreamWorks' attorneys were obligated to review and produce voluminous discovery material, file numerous briefs, attend a series of court hearings, and participate in at least 12 full days of depositions. As the litigation proceeded, in an effort to increase the pressure on DreamWorks to settle his fraudulent claim, Gordon, through his attorneys, provided DreamWorks' attorneys with a report in which an expert that Gordon had hired offered his opinion that Gordon was entitled to more than $150 million in damages.

Gordon did not pay for his attorneys' work on the civil litigation. Instead, he had a contingency fee arrangement that would have allowed the attorneys to keep a percentage of any award that Gordon received from DreamWorks after trial or as a settlement. But DreamWorks spent approximately $1 million to defend the lawsuit, and its insurance company spent approximately $2 million, for a total of approximately $3 million in legal fees.

### Gordon's Destruction of Computer Evidence

Because Gordon said that he used the computer program Photoshop to revise his Panda Power drawings, and because his Panda Power stories and character descriptions appeared to have been created on a computer, DreamWorks requested, in the civil discovery process, copies of the contents of Gordon's computers. Gordon refused, saying, through counsel, first that he did not currently have any computers, and later that the computers he did have did not contain any evidence relevant to the lawsuit.

Still concerned that Gordon's computers contained relevant evidence, DreamWorks, on

March 12, 2012, filed a motion asking the judge to compel Gordon to produce the contents of his computers. On April 10, 2012, while that motion was pending, Gordon used a commercial software program called Permanent Eraser to erase many of the files on his primary Apple iMac computer. Permanent Eraser does not come with the Apple iMac but rather is a program that Gordon installed on that computer. It erases files more completely than the standard method of putting them in the "Trash." Gordon then deleted the Permanent Eraser software itself, using the Trash function, on April 13, 2012. On April 13, 2012, Gordon also used Apple's built-in Erase function to delete additional files and file fragments on his primary computer.

The district court granted DreamWorks' motion to compel on April 17, 2012, and ordered Gordon to turn over the contents of his computers, which he ultimately did. When DreamWorks' forensic examiner reviewed them, he discovered evidence of Gordon's deletions. The forensic examiner also discovered evidence that, before the deletions, there had been more than 100 file folders on Gordon's primary computer that were related to DreamWorks' *Kung Fu Panda* or Gordon's Panda Power and therefore relevant to the litigation. Although Gordon had deleted the file folders themselves, and the files within them, the forensic examiner was able to determine the file paths and names, including those listed below, which were all on the Desktop of Gordon's computer:

KFP concept

kidd face

***kidd face/** Jayme Gordon's KFPPa.,¢/***QUESTIONS

NOW I'm LATE/CRANE no HAT

NOW i'm LATE/MARLET -unused REDD fox

kung-fu-panda-3928- 2560x1600.jpg.download

***Gordon Traced Panda Power Drawings From Disney Coloring Book***

After it found that Gordon had deleted relevant documents from his computers, DreamWorks discovered that Gordon had, in fact, traced significant parts of many of his Panda Power drawings from a Disney coloring book and that he had backdated some of his sketches. The coloring book, called "The Lion King's Timon & Pumba," was published by Disney in 1996. A side-by-side comparison demonstrates the tracing:

**<u>1996 Disney Coloring Book</u>**  **<u>GORDON's 2000 Registration</u>**

  

**1996 Disney Coloring Book (closeup)**



**GORDON's 2000 Registration (closeup)**



**1996 Disney Coloring Book**



**GORDON's 2000 Registration**



Gordon therefore drew the sketches based on these coloring book pages after 1996 (when Disney published the coloring book) and backdated them to dates in the early 1990s, in an effort to further his fraud scheme.

### *Gordon Dismissed His Suit Against DreamWorks*

After DreamWorks provided Gordon's attorneys with copies of the 1996 coloring book and an analysis documenting that Gordon traced his Panda Power characters from it, Gordon and his attorneys agreed to dismiss the copyright infringement suit against DreamWorks. He filed his

dismissal on July 30, 2013, after 2 ½ years of litigation.

### *Wire Transmissions – Counts 1-4*

Gordon's civil copyright infringement lawsuit was not only baseless, but it was also clearly designed to fraudulently obtain a multi-million dollar settlement from DreamWorks. The settlement proposal, sent via email, and the email correspondence from Gordon's attorneys that sought discovery in the civil lawsuit were all wire transmissions in furtherance of the scheme. Gordon filed what he knew was a meritless civil suit that was rife with misrepresentations and false statements, hoping that DreamWorks would agree to a settlement rather than spending millions of dollars on legal fees. Because his lawsuit was dependent on demonstrating that he had created the *Kung Fu Panda* characters, Gordon modified and backdated sketches to make it appear as though he had created his characters in the early 1990's.

Specifically, Gordon is charged with causing the following wire transmissions to be sent in furtherance of the scheme:

- *Count 1*: July 1, 2011—Settlement proposal, sent via e-mail, from one of Gordon's attorneys, in Boston, MA, to DreamWorks' attorneys in New York, NY and Los Angeles, CA.

- *Count 2*: August 30, 2011—3-page letter, sent via e-mail, from one of Gordon's attorneys in New York, NY to DreamWorks' attorneys in Boston, MA, New York, NY, and Los Angeles, CA, asking DreamWorks to produce additional documents.

- *Count 3*: October 6, 2011—2-page letter, sent via e-mail, from one of Gordon's attorneys in New York, NY to DreamWorks' attorneys in Boston, MA, New York, NY, and Los Angeles, CA, responding to DreamWorks' request that Gordon produce electronic evidence.

- *Count 4*: January 31, 2012— E-mail from one of Gordon's attorneys in New York, NY to DreamWorks' attorneys in New York and Los Angeles, CA, and to another of Gordon's attorney's in Boston, about scheduling seven depositions.

## II.      Gordon's Lies Under Oath and the Perjury Counts

As part of its defense of the civil suit, DreamWorks took Gordon's deposition over the course of three days.  Gordon's testimony was under oath and was recorded by a stenographer and a videographer.  During the course of that deposition, Gordon lied at least four times, in an effort to further his fraud scheme.  Three of those lies serve as the basis for the Indictment's perjury counts.

### *Perjury – Count Five*

On May 15, 2012, Gordon made the following statements, in response to questions from DreamWorks' counsel:

> Q. Well, let me rephrase the question. In creating what you call your characters –
>
> A. Mm-hm.
>
> Q. -- did you ever take elements from other people's cartoons?
>
> A. No, I wouldn't say I took elements, no.
>
> Q. So yours -- your works are all original and aren't based on any preexisting cartoons by anybody else --
>
>      [Gordon's counsel]: Objection.
>
> Q. -- is that your testimony?
>
>      [Gordon's counsel]: Objection, vague and compound.
>
> Q. You can answer.
>
> A. Again, I grew up drawing a lot of different cartoon characters, so how I interpret things or something down the line, but no, no directly -- I didn't directly take elements from something, no,  not that I was ever aware of.

This statement was false and misleading because, as Gordon knew, he had traced his Kid and Red panda characters from a Disney coloring book.

*Perjury – Count Six*

On December 15, 2011, Gordon made the following statements, in response to questions from DreamWorks' counsel about the image below:



Q. Mr. Gordon, we were looking before the lunch break at Exhibit 52. Do you still have that in front of you?

A. Yes.

Q. Okay. If you look at the document 1065 -- do you see that drawing?

A. Yes.

Q. Okay. This document in the upper left-hand corner has the words "K.F.P.P." on it. Underneath it has "'80 -- '92"; do you see that?

A. Yes.

Q. What does the "'80 -- '92" mean?

> A. I would guess I drew it in '92 and would probably consider the creation '80, and I was marking it for creat -- just a note to myself, maybe, that I considered it created in '80 at the time, but the drawing was in '92.
>
> Q. And you put that marking on at the same time you drew the rest of the drawing?
>
> A. It looks that way.
>
> Q. Well, my question to you is, is that what you did?
>
> A. It looks that way. I would assume so.
>
> Q. Do you know?
>
> A. Yes, I did. I mean, obviously, I marked it in '92.

This statement was false and misleading because, as Gordon knew, he had copied the panda drawing right below that date from the 1996 Disney coloring book. He therefore did not mark "'92" on the drawing in 1992 at the same time that he drew the rest of the drawing. Rather, he backdated the drawing to further his fraud scheme.

### *Perjury – Count Seven*

On December 15, 2011, Gordon made the following statements, in response to questions from DreamWorks' counsel:

> Q. Do you make a habit of discarding computers and not copying what's on the computer?
>
> A. I'm not sure what -- I typically use a computer like a typewriter, to make something and . . .
>
> Q. Well, do you save files on the computer?
>
> A. Not really, no.

This statement was false and misleading because, as Gordon knew, he had saved more than 100 folders on his computer, many of which were related to his Panda Power characters or

DreamWorks' *Kung Fu Panda*.

### *Additional False Statement*

On December 14, 2011, Gordon made the following statements, in response to questions from DreamWorks' counsel:

> Q. Have the characters of your pandas changed, Kidd and Redd, since you claimed that you had created them in the early '90s?
>
> A. In what way?
>
> Q. In any way.
>
> A. No.

This statement was false and misleading because, as Gordon knew, he had changed the "character profiles" of his characters, and reversed their personalities so that the characters more closely matched DreamWorks' *Kung Fu Panda* characters, as is shown below:

*GORDON's 2000 Registration*         *GORDON's 2008 "Kung Fu Panda Power"*




*Red Panda*™

Fast as a bullet, eye on the ball, agile and limber, about 2 feet tall.

Playful and mischievous, the life of the crowd, a guardian of goodwill this panda is proud.

Red is the more immature of the two pandas often finding himself needing to be saved by Kid. He is a prankster and sees the humor in most situations. Unlike Kid he is tired of eating Chinese take out and often enjoys more variety.

*REDD PANDA*™

Fast as a bullet, eye on the ball, agile and limber, about 2 feet tall.

Serious yet fun loving, the life of the crowd, a guardian of goodwill this panda is proud.

Redd™ is the more mature of the 2 pandas often finding himself playing the role of big brother to Kidd™ He is very serious about training, but also has a dry sense of humor and does find some things funny and enjoys the occasional prank. Unlike Kidd™ He is tired of eating Chinese Take-Out and often enjoys more variety.

## III.    The Evidence

### A.  Witnesses

The Government anticipates calling less than ten witness,[1] who fall into several categories: (1) witness(es) from DreamWorks; (2) a witnesses from Disney; (3) an attorney who represented DreamWorks in the civil litigation; (4) an art expert hired by DreamWorks in the civil litigation; (5) a forensics expert who previously analyzed Gordon's computers for the civil litigation; (6) an agents and a summary witness to introduce evidence; and (7) if stipulations cannot be obtained, records custodians to authenticate evidence.

---

[1] The government has included some witnesses it may not need to call if additional stipulations are obtained, and thus this number may be reduced. Based on discussions with defense counsel, the government already believes that at a minimum, certain authentication witnesses will not be necessary, and thus has not included them in this count.

### 1. DreamWorks Witnesses

The government anticipates calling one current and one former DreamWorks witness. Each will testify, with regard to different aspects and time periods, to the actual development of characters and story that became the Kung Fu Panda movie, and provide a description of the characters and storyline of the movie. They will explain that trailers and other promotional materials were released in advance of the premiere of the movie, and will explain what elements of the story were available before the release. They will describe how DreamWorks handles unsolicited artwork submissions, such as the ones sent by Gordon.

### 2. Disney Witness

The 1996 Lion King/Timon & Pumba coloring book that Gordon traced to create his Panda Power characters was based on an episode of a Timon & Pumba television show titled "Don't Break the China," which was produced by Disney. A Disney Witness involved in the show will testify about the development of the show, the creation and airing of that episode, and the process through which derivative products, such as the coloring book, are created.

### 3. Attorney who Represented DreamWorks in the Civil Litigation

Loeb & Loeb LLP was DreamWorks' primary counsel in the Civil Litigation. Jonathan Zavin, from Loeb & Loeb, will testify about the underlying civil litigation: the timeline, the work that was done (and costs incurred) in defending the litigation; the depositions; the litigation about Gordon's computers; the discovery of the coloring book; and the eventually dismissal of the lawsuit. He will also testify about the settlement discussions and demands and the communications about discovery that form the basis of the wire fraud counts. In order to provide the jury with a

basis for understanding the civil lawsuit, Mr. Zavin will also briefly explain the copyright registration process.

### 4. Art Expert – Michael Knapp

Michael Knapp was hired by DreamWorks to conduct a comparative artistic analysis of the works at issue in the civil litigation. Specifically, he analyzed and assessed (i) whether elements of DreamWorks's 2008 film Kung Fu Panda were "strikingly or substantially similar" to Gordon's copyright materials and (ii) whether the artwork allegedly discovered in 2009 shared sufficient similarities with Gordon's other works from the early 1990s to suggest that they were created at the same time. Knapp's expert report concluded that the answer to both questions was a "resounding no." Knapp will testify at this trial about his retention by DreamWorks, the processes he undertook for his analysis, and the basis for his conclusions. Knapp will testify that when the 1996 Coloring Book was discovered – after he had completed that analysis and submitted his expert report – it supported his conclusions. Knapp will explain that when he saw the coloring book, he was able to determine conclusively that Gordon's drawings were traced from that coloring book, and that he prepared another supplemental affidavit to that effect, which became moot when Gordon dismissed his lawsuit.

### 5. Forensics Expert – Sankara Shanmugam

Sankara Shanmugam, previously from the firm Protiviti and now at Stroz Friedberg, was hired by DreamWorks in the civil litigation. Initially, Protiviti was retained to assist in the eDiscovery process—it was anticipated that Gordon's computers would contain materials responsive to search terms negotiated by the parties, and that Protiviti would extract these materials and load them onto a document review platform. When the computers did not contain any of the

expected materials, Shanmugam undertook a forensic examination of the computers, and eventually determined that Gordon had engaged in deliberate efforts to delete the relevant contents of his computer. Shanmugam was able to determine, based on the file names, that many of the deleted materials were directly relevant to the civil litigation. Shanmugam will testify about his review of Gordon's computer and about his discovery of the names of the deleted file folders, the remnants of the Permanent Eraser program, and his conclusion that Gordon had deleted the relevant documents while the motion to compel the production of the computer was pending.

### 6. Agent and Summary Witness to Introduce Evidence

There are a number of relevant materials that are voluminous and/or lengthy, including the complete set of Gordon's Copyright Registrations and the civil depositions. The government anticipates calling a summary witness to provide an overview of these materials, to highlight the most relevant portions, and introduce them into evidence. Similarly, the government anticipates calling an agent witness to assist in introducing exhibits in a manner that is efficient and helpful for the jury. For instance, in order to introduce the specific excerpts of the Gordon videotaped deposition that form the basis of the perjury counts, the Government expects that it will ask an agent who has viewed the entire videotaped deposition to introduce the relevant excerpts on the stand.

### 7. Witnesses to Establish Authenticity if Stipulations Not Obtained

The Government expects, based on recent discussions with newly-retained defense counsel, that the Defendant will stipulate to the authenticity of various categories of records, and that there will not be a need to call witnesses to establish, for instance, chain of custody or the

authenticity of business records.  If the Defendant's position changes, the Government will need to call additional witnesses.

### B. Exhibits

The government intends to introduce several categories of exhibits, including:

#### 1. Art/Intellectual Property Evidence

The art and intellectual property evidence will be central to the trial and will include:

- Kung Fu Panda Movie (excerpts)

- Kung Fu Panda Trailers & Pre-Release Promotional materials

- 1996 Disney Timon & Pumba Coloring Book

- Timon & Pumba "Don't Break the China" Television Episode (excerpts/stills)

- Gordon's Copyright Registrations

- The drawings of Gordon's Panda Characters he claimed were discovered in 2009.

#### 2. Court Filings & Other Material from the Civil Litigation

The Government will introduce a handful of publicly filed court documents, as well as some additional materials exchanged by the parties in the civil litigation process, directly relevant to issues at trial:

- Gordon's Civil Complaint and the Amended Complaint;

- Videotaped Deposition of Gordon (excerpts);

- The letters and cover emails between Gordon's attorneys and Loeb & Loeb that form the basis of the wire fraud counts;

- The Privilege Log provided by Gordon to Loeb & Loeb (which evidences the timing of his contacts with his attorneys);

- An expert report provided by Gordon to DreamWorks analyzing his "damages" and concluding that they were approximately $150 million dollars;

- Gordon's Submission and Rejection Letters to DreamWorks

### 3. Chalks/Demonstrative Evidence

The Government also expects to use, with the testimony of the agent and/or summary witness, one or more chalks, to assist the jury in viewing the evidence, which is exceptionally visual. The Government expects that these chalks may include images taken from materials in evidence and a timeline of relevant events. The government will not be seeking to introduce these chalks into evidence.

## IV. LEGAL ISSUES

At this point, the government does not anticipate any legal issues that the Court will need to resolve. That is largely because of the very productive working relationship that the prosecutors and former defense counsel Robert Griffin have had since before this case was indicted. Based on preliminary conversations, it appears that the relationship with successor defense counsel, Jeffrey Denner, will be similarly productive. The parties have agreed to try to work out as many stipulations as possible, in an effort to streamline the trial and focus it on the truly relevant and disputed issues.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:     /s/ Amy Harman Burkart
        Amy Harman Burkart
        Adam J. Bookbinder
        Assistant U.S. Attorneys
        U.S. Attorney's Office
        U.S. Courthouse, Suite 9200
        1 Courthouse Way
        Boston, MA 02210

Date:   October 7, 2016

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2016, I caused a copy of the Government's Trial Brief to be served on counsel for Jayme Gordon by ECF.

*/s/ Amy Harman Burkart*
Amy Harman Burkart
Assistant U.S. Attorney